Slip Op. 19-86

# UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **PRIME TIME COMMERCE LLC,**<br><br>                    **Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>                    **Defendant.** |

**Before: Claire R. Kelly, Judge**

**Court No. 18-00024**

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the administrative review of certain cased pencils from the People's Republic of China.]

Dated: July 9, 2019

<u>Mark Burton Lehnardt</u> and <u>Lindita Valentina Ciko Torza</u>, Baker & Hostetler, LLP, of Washington, DC, argued for plaintiff Prime Time Commerce LLC.

<u>Ashley Akers</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  On the brief were <u>Patricia M. McCarthy</u>, Assistant Director, <u>Jeanne E. Davidson</u>, Director, and <u>Joseph H. Hunt</u>, Assistant Attorney General.  Of Counsel on the brief was <u>Brendan Scott Saslow</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:  This action is before the court on a motion for judgment on the

agency record challenging various aspects of the U.S. Department of Commerce's

("Department" or "Commerce") final determination in the administrative review of the

antidumping duty ("ADD") order covering certain cased pencils from the People's

Republic of China ("PRC"), filed by Plaintiff, Prime Time Commerce, LLC ("Prime Time").

<u>See</u> [Prime Time's] Mot. [ ] J. Agency R., Sept. 18, 2018, ECF No. 20; <u>see also</u> Certain

Cased Pencils From the [PRC], 83 Fed. Reg. 3,112 (Dep't Commerce Jan. 23, 2018)

(final results of [ADD] admin. review; 2015–2016) ("Final Results") and accompanying

Issues & Decision Mem.: Certain Cased Pencils from the [PRC]; 2015–2016, A-570-827,

(Jan. 16, 2018), ECF No. 12-4 ("Final Decision Memo"); Certain Cased Pencils From the

[PRC], 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994) ("ADD Order").  Prime Time

commenced this action pursuant to section 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of

the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and

1516a(a)(2)(B)(iii) (2012).[1]  See Summons, Feb. 8, 2018, ECF No. 1; Compl., Feb. 8,

2018, ECF No. 4.  Prime Time is an importer of the subject merchandise.

Prime Time challenges as contrary to law and unsupported by substantial evidence

Commerce's decisions (i) to reject and remove from the record Prime Time's response to

a Sections C&D questionnaire issued to Ningbo Homey Union Co., Ltd. ("Homey"),

offered as either a questionnaire response or as factual information not elsewhere

defined, and the accompanying explanations,[2] see Mem. Supp. [Prime Time's] Rule 56.2

Mot. [ ] J. Agency R. at 18–31, Sept. 18, 2018, ECF No. 20-1 ("Prime Time's Br."), (ii) to

assign the PRC-wide rate, the highest rate available, as Homey's dumping margin,

without considering Prime Time's efforts to populate the record, and (iii) to assign Prime

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[2] The party filing new factual information must identify the subsection of 19 C.F.R. § 351.102(b)(21) (2017) that best describes the information proffered.  19 C.F.R. § 351.301(b). Further, a party seeking to file the information pursuant to 19 C.F.R. § 351.301(c)(5), must also include a "detailed narrative" of admissibility.

Court No. 18-00024                                                                 Page 3

Time the PRC-wide rate, the highest available rate, instead of calculating an importer-specific assessment rate.  Id. at 17–18, 31–35.

For the reasons that follow, the court sustains Commerce's decision that Prime Time's submission, offered as a questionnaire response pursuant to 19 C.F.R. § 351.301(c)(1) (2017),[3] was an unsolicited questionnaire response.  The court, however, concludes that Commerce acted contrary to law when it removed Prime Time's information, submitted as factual information not elsewhere defined under 19 C.F.R. § 351.301(c)(5), and the accompanying narrative of admissibility, from the record.  The court further concludes that Commerce's decision not to accept Prime Time's submission as factual information not elsewhere defined is not supported by substantial evidence because Commerce removed from the record the very basis for that determination.  On remand, Commerce must place Prime Time's narrative of admissibility and submission on the record.  Further, on remand, Commerce must consider Prime Time's submission, as filed under 19 C.F.R. § 351.301(c)(5), in the context of calculating an importer-specific assessment rate for Prime Time's entries.  If Commerce is unable to calculate an importer-specific assessment rate on the entries of subject merchandise exported by Homey and imported by Prime Time, Commerce must explain the basis for such a conclusion.  If Commerce invokes its practice as a basis for not calculating such a rate, Commerce should explain why its practice is reasonable in light of 19 C.F.R. § 351.212(b).

---

[3] Further citations to Title 19 of the Code of Federal Regulations are to the 2017 edition.

## BACKGROUND

Commerce initiated this administrative review covering the subject merchandise entered during the period of review, December 1, 2015, through November 30, 2016. <u>See Initiation of Antidumping and Countervailing Duty Admin. Reviews</u>, 82 Fed. Reg. 10,457, 10,459 (Dep't Commerce Feb. 13, 2017) ("<u>Initiation Notice</u>").  Of the six companies subject to the <u>ADD Order</u>, only Homey and Orient International Holding Shanghai Foreign Trade Co., Ltd. ("Orient"), entered subject merchandise during the period of review. Resp't Selection [Mem.] at 1, PD 23, bar code 3558523-01 (Mar. 30, 2017).[4]  Pertinent here, Homey is Prime Time's unaffiliated exporter.  <u>See</u> Prime Time's Br. at 1; [Prelim.] Decision Mem. for [ ] Certain Cased Pencils from the [PRC] at 2, A-570-827, PD 63, bar code 3614317-01 (Aug. 31, 2017) ("Prelim. Decision Memo").  On March 15, 2017, Homey filed a separate rate application, and following Orient's withdrawal of its request for review, became the sole mandatory respondent.  Prelim. Decision Memo at 2; <u>see also</u> [Orient's] Withdrawal Req. Review, PD 22, bar code 3553055-01 (Mar. 17, 2017). Homey, following submission of its separate rate application, stopped cooperating with Commerce's requests for information.  <u>See</u> Prelim. Decision Memo at 2; Final Decision Memo at 5.  Prime Time attempted to substitute its responses for Homey's and populate the record with factual information.  Prime Time's Br. at 6–7.  It also sought to suggest gap filling measures where it was unable to supply the information needed.  <u>Id.</u>

---

[4] On March 26, 2018, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 12-2–3.  All further references to administrative record documents in this opinion will be to the numbers assigned to the documents by Commerce in the indices.

Prime Time filed a Sections C&D Questionnaire response on behalf of Homey, contending it was admissible under 19 C.F.R. § 351.301(c)(1) or, in the alternative, 19 C.F.R. § 351.301(c)(5).  Rejection Letter at 1.  Prime Time explained that its submission consisted of new factual information as per 19 C.F.R. § 351.102(b)(21)(i).  Id.  Commerce declined to accept the submission under either 19 C.F.R. § 351.301(c)(1) or (c)(5) and removed it, along with the accompanying explanations, from the record.  [Commerce's] Rejection of Unsolicited New Factual Info. Mem., PD 38, bar code 3580223-01 (June 9, 2017) ("Rejection Letter").  Commerce similarly denied Prime Time's August 3, 2017, request for reconsideration.  See [Prime Time's Req. Reconsideration], PD 60, bar code 3604262-01 (Aug. 3, 2017) ("Reconsideration Req."); Prelim. Decision Memo at 3 n.16.

To the extent that Prime Time's submission sought to satisfy 19 C.F.R. § 351.301(c)(1) by presenting factual information responsive to a questionnaire Commerce sent to Homey, Commerce explained that it rejected the submission as an unsolicited questionnaire response in accordance with 19 C.F.R. § 351.302(d).  Rejection Letter at 1.  To the extent that Prime Time's submission purported to contain factual information not elsewhere defined per 19 C.F.R. § 351.301(c)(5), Commerce rejected it based on the insufficiency of Prime Time's accompanying narrative of admissibility.[5]  Id. at 2.  Specifically, Commerce explained that increased financial hardship for the importer, arising out of an exporter's and/or producer's failure to cooperate, is a known liability and

---

[5] Because Commerce rejected Prime Time's submission in its entirety, i.e., the questionnaire response, suggestions for gap filling measures, and all relevant explanations of admissibility, see Rejection Letter at 2, the court cannot review Prime Time's explanations or meaningfully assess Commerce's response to it.  The court can only describe Commerce's description of Prime Time's submission and accompanying explanations, and Commerce's response.

not grounds for considering the proffered information.[6]  Id.  Further, Commerce explained that it is not its practice to calculate an importer-specific assessment rate unless a margin is calculated for each individually examined exporter.  Id.  Commerce does not state that it is unable to calculate an importer-specific assessment rate given the factual circumstances in this case.  Id.  It likewise does not explain why its practice is reasonable in light of 19 C.F.R. § 351.212(b)'s directive to calculate importer-specific assessment rates whenever Commerce conducts a review of an antidumping duty order.  Id.  Commerce also explained that Prime Time's submission did not meet the requirements of 19 U.S.C. § 1677m(e)[7] to qualify as information that is "necessary to the determination" and which Commerce must consider.  Rejection Letter at 2.  Commerce explained that

---

[6] It is not clear to the court whether Commerce rejected Prime Time's submission under 19 C.F.R. § 351.301(c)(5) because the explanation accompanying it was inadequate, because Commerce determined that it was not required to calculate an importer-specific assessment rate in this case, or some combination of both.  In its rejection letter, Commerce, in a stand-alone paragraph, asserts that where a margin is not calculated for each individually examined exporter, its practice is not to calculate an importer-specific assessment rate.  Rejection Letter at 2.  In the subsequent paragraph, offset by the word "further" and explicitly referencing 19 C.F.R. § 351.301(c)(5), Commerce concludes that undue economic hardship onto the importer is an expected aftereffect of a statutory scheme that seeks to encourage producers and exporters to cooperate.  Id.  Commerce's latter explanation assumes that the importer in question is not entitled to an importer-specific assessment rate.  Given that Commerce removed Prime Time's submission in its entirely from the record, the court cannot assess the parameters or reasonableness of Commerce's basis for rejecting the submission.

[7] Pursuant to 19 U.S.C. § 1677m(e), Commerce "shall not decline to consider" information that is "necessary to the determination but does not meet all the applicable requirements," if

    (1)  the information is submitted by the deadline established for its submission,
    (2)  the information can be verified,
    (3)  the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
    (4)  the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and
    (5)  the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

the submission was so incomplete as to not be reliable and could not be used without undue difficulty.  Id.; see also 19 U.S.C. § 1677m(e)(3), (5).  Commerce rejected and removed all filings associated with Prime Time's submission from the record.  See Rejection of Unsolicited Info., PD 39, bar code 3582419-01 (June 9, 2017); [Notice Doc. Rejected & Removed], PD 32, bar code 3570939-01 (May 10, 2017).

In its preliminary determination, Commerce applied the PRC-wide rate of 114.90% rate to all of Homey's entries.  See generally Certain Cased Pencils From the [PRC], 82 Fed. Reg. 43,329 (Dep't Commerce Sept. 15, 2017) (preliminary results of [ADD] admin. review, prelim. determination of no shipments, & rescission of review in part; 2015–2016) and accompanying Prelim. Decision Memo at 6.  It explained that Homey, as both a separate rate applicant and a mandatory respondent, had to satisfy dual obligations— submit a separate rate application and answer all questionnaires required of it as a mandatory respondent—or become ineligible for separate rate status.  Prelim. Decision Memo at 5 (citing Initiation Notice, 82 Fed. Reg. at 10,458 (laying out the dual obligations)).  Further, Commerce continued to find that Prime Time's submission constituted unsolicited new factual information and that the request for reconsideration did not offer new grounds for reconsideration.  Prelim Decision Memo at 3 & n.16; see also Reconsideration Req. at 1–2.  In its case brief to the agency, Prime Time continued to challenge Commerce's decision to reject and remove the submission and argue that Commerce should calculate an importer-specific assessment rate for Prime Time.  [Prime Time's Agency] Case Br. at 3–9, PD 69, bar code 3630073-01 (Oct. 16, 2017).

Court No. 18-00024                                                                    Page 8

For the final determination, Commerce continued to find that Homey was part of the PRC-wide entity and ineligible for a separate rate.  Final Results, 83 Fed. Reg. at 3,113; Final Decision Memo at 7.  Commerce also continued to find Prime Time's submission contained unsolicited new factual information and explained that it was not required to calculate an importer-specific assessment rate for Prime Times' entries.  See Final Decision Memo at 4–6.  Oral argument was held on April 30, 2019.  Following oral argument, the court directed the parties to file supplemental briefing regarding Commerce's obligation to calculate an importer-specific assessment rate.  See generally Def.'s Resp. Ct.'s May 13, 2019, Qs., May 23, 2019, ECF No. 34 ("Def.'s Suppl. Br."); Pl.'s Resp. Ct.'s May 13, 2019, Qs., May 23, 2019, ECF No. 35 ("Pl.'s Suppl. Br."); Pl.'s Resp. [Def.'s Suppl. Br.], May 30, 2019, ECF No. 36; Def.'s Resp. [Pl.'s Suppl. Br.], May 30, 2019, ECF No. 37.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce's Rejection and Removal of Prime Time's Submission

Prime Time challenges as unsupported by substantial evidence and not in accordance with law Commerce's decision to reject and remove from the administrative

record Prime Time's response to Commerce's Sections C&D Questionnaire.  See Prime

Time's Br. at 18–31.  Defendant responds that Commerce reasonably determined that

Prime Time's submission was unsolicited and unacceptable under the relevant regulatory

and statutory framework.   Def.'s Resp. Br. at 12–21.   For the following reasons,

Commerce's decision to reject Prime Time's submission, offered as factual information

not elsewhere defined under 19 C.F.R. § 351.301(c)(5), is unsupported by substantial

evidence and its decision to remove the submission, along with the accompanying

narrative of admissibility, from the record is contrary to law.

The court must base its review of Commerce's determination upon the record of

the proceeding, which consists of

> (i) a copy of all information presented to or obtained by the Secretary, the
> administering authority, or the Commission during the course of the
> administrative proceeding, including all governmental memoranda
> pertaining to the case and the record of ex parte meetings required to be
> kept by section 1677f(a)(3) of this title; and

> (ii) a copy of the determination, all transcripts or records of conferences or
> hearings, and all notices published in the Federal Register.

19 U.S.C. § 1516a(b)(2)(A)(i)–(ii).  Commerce's regulations require it to maintain "the

official record of each segment of the proceeding" that will form the record reviewed by

this Court.  19 C.F.R. § 351.104(a)(1).  The official record will contain,

> all factual information, written argument, or other material developed by,
> presented to, or obtained by the Secretary during the course of a
> proceeding that pertains to the proceeding. . . . [and] government
> memoranda pertaining to the proceeding, memoranda of ex parte meetings,
> determinations, notices published in the Federal Register, and transcripts
> of hearings. The official record will contain material that is public, business
> proprietary, privileged, and classified.

Id.[8]  Commerce, however, is not required to retain on the record copies of untimely filed documents or unsolicited questionnaire responses.  19 C.F.R. § 351.104(a)(2)(iii); see also 19 C.F.R. § 351.302(d).

Commerce's regulations define admissible "factual information" and prescribe how parties provide such information to the agency.  See 19 C.F.R. § 351.102(b)(21) (defining "factual information"); 19 C.F.R. § 351.301 (setting time limits and parameters governing how the various categories of factual information are provided to the agency).  Relevant here are 19 C.F.R. § 351.301(c)(1), providing for factual information submitted in

---

[8] Commerce's regulation further recognizes that copies of rejected written argument, factual information, and other material, will be included on the record "solely for the purposes of establishing and documenting the basis for rejecting the document," when the basis of the rejection occurred under any of the following circumstances:

> (A) The document, although otherwise timely, contains untimely filed new factual information (see § 351.301(b));
>
> (B) The submitter made a nonconforming request for business proprietary treatment of factual information (see § 351.304);
>
> (C) The Secretary denied a request for business proprietary treatment of factual information (see § 351.304);
>
> (D) The submitter is unwilling to permit the disclosure of business proprietary information under APO (see § 351.304).

19 C.F.R. § 351.104(a)(2)(ii)(A)–(D).  It is possible to read this regulation as carving four specific scenarios under which Commerce is required to keep rejected materials on the record.  However, because such a reading would preclude judicial review of any other decision Commerce makes to reject factual information, it would be unreasonable.  A reasonable reading of 19 C.F.R. § 351.104(a)(2)(ii), in light of 19 U.S.C. § 1516a(b)(2)(A) and 19 C.F.R. § 351.104(a)(1), is that Commerce retains all factual information, unless it is untimely or constitutes an unsolicited questionnaire response.  And, in the four enumerated scenarios, it retains the rejected document solely for the purposes of establishing and documenting the basis for the rejection because it is only in those four scenarios that Commerce may categorically reject the documents and not consider the information they contain.  Notwithstanding whether Commerce's basis for rejecting the document is categorical or the result of Commerce considering the information within, Commerce must retain the document and explain its decision to reject; anything less would deprive the Court of its power of judicial review.  Commerce can only reject and not retain on the record submissions specifically identified in 19 C.F.R. § 351.104(a)(2)(iii), i.e., untimely filed documents or unsolicited questionnaire responses.

response to a questionnaire, and 19 C.F.R. § 351.301(c)(5), providing for factual information not elsewhere defined and requiring the submitter to explain why the information is not encompassed in the categories of 19 C.F.R. § 351.102(b)(21)(i)–(iv) and to provide a "detailed narrative" as to the contents and relevance of the information proffered. See 19 C.F.R. § 351.301(c)(5). Further, when Commerce rejects a submission it determines to be an unsolicited questionnaire response, it will, "to the extent practicable," state the basis for the rejection. 19 C.F.R. § 351.302(d)(2).

Pursuant to 19 U.S.C. § 1677m(e), Commerce "shall not decline to consider" information that is "necessary to the determination but does not meet all the applicable requirements," if

(1) the information is submitted by the deadline established for its submission,
(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and
(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e)(1)–(5).

Prime Time asserted two alternative bases for its submission, 19 C.F.R. § 351.301(c)(1) (questionnaire response) or 19 C.F.R. § 351.301(c)(5) (factual information not elsewhere defined); both of which Commerce rejected. Rejection Letter at 1–2; Final Decision Memo at 4–5. First, Prime Time asserted that its submission should be accepted as a questionnaire response substituting that of the mandatory respondent's. See Reconsideration Req. at 1–2; Prime Time's Br. at 5–6, 18–19. Commerce concluded

that Prime Time's submission could not be accepted under 19 C.F.R. § 351.301(c)(1) because it was an unsolicited questionnaire response, see 19 C.F.R. § 351.302(d). Rejection Letter at 1–2.  Second, Prime Time asserted that its submission provided relevant factual information, as defined by 19 C.F.R. § 351.301(c)(5). See Prime Time's Br. at 18–20.  Commerce concluded that Prime Time's explanation that it would be exposed to "undue financial hardship" as a result of Commerce assigning it the mandatory respondent's rate, instead of calculating an importer-specific assessment rate, was insufficient for Commerce to accept the information as factual information not elsewhere defined.[9]  Rejection Letter at 2.

Commerce's regulations do not define what it means for a questionnaire response to be "unsolicited," but do provide an example of what is a solicited questionnaire response.  Specifically, a questionnaire response filed by a voluntary respondent is solicited.  19 C.F.R. § 351.302(d)(ii); 19 C.F.R. § 351.204(d)(2).  Voluntary respondents are subject to the same requirements as mandatory respondents.   19 C.F.R. § 351.204(d)(2).  Commerce's regulations, therefore, imply that questionnaires should be answered by respondents.  Commerce, as the administrator of the review process, can structure the receipt of factual information and specify the parties who are eligible to respond to its questionnaires.  Given that interested parties, like Prime Time, have other avenues to submit factual information, it was reasonable for Commerce to reject the submission under 19 C.F.R § 351.301(c)(1) because it was an unsolicited response

---

[9] As explained above, because Commerce removed Prime Time's submission in its entirety the parameters of why Commerce rejected the submission are not clear to the court.

provided by a party other than to whom it was originally addressed.[10]  Further, in stating

the    basis    for    the    rejection,    Commerce    complied    with    19    U.S.C.

§ 1677m(e).  Rejection Letter at 2.  Commerce explained that Prime Time's submission,

as it disclosed information relevant to calculating Homey's dumping margin, was so

incomplete as to be unreliable and could not be verified or used without undue difficulties.

Id.  Commerce's decision not to accept the submission on these grounds is reasonable,

given that Prime Time's submission could not be verified against Homey's own books and

records and would require Commerce to rely information from an amalgamation of

sources.  Further, because Commerce is not required to retain on the record unsolicited

questionnaire responses, Commerce did not act contrary to law by refusing to retain

---

[10] Prime Time contends that Defendant offers a post-hoc rationalization when it argues that the
role of the submitting party in the review determines whether a response is unsolicited.  See
[Prime Time's] Reply Br. Supp. Rule 56.2 Mot. J. Agency R. at 2–3, 4–5, Jan. 11, 2019, ECF No.
25 ("Prime Time's Reply Br.") (citing Def.'s Resp. Br. at 13).  Prime Time's argument is
unpersuasive.  Commerce does distinguish Prime Time from the mandatory respondent and
states that it is for the latter, and not for the former, that it would use the proffered information to
calculate a dumping margin.  See Rejection Letter at 1–2 (remarking that Commerce requested
the information from Homey, not Prime Time); Prelim. Decision Mem. at 3 n.16 (remarking that
basis for rejecting the information remains unchanged); Final Decision Memo at 4 (explaining that
because Prime Time's submitted the information, it was unsolicited).  It also cites to 19 C.F.R.
§ 351.302(d), which explicitly states that a questionnaire response filed by a voluntary respondent
is not unsolicited.  See id.  Given that a voluntary respondent has all the same obligations as a
mandatory respondent, 19 C.F.R. § 351.204(d)(2), it is reasonably discernable that Commerce
drew the line between solicited and unsolicited based on the party's role in the review.

     Prime Time's contention that, in the final determination, Commerce "abandoned" the
justification it provided for rejecting the submission under 19 C.F.R. § 351.301(c)(5) in the
Rejection Letter, see Prime Time's Reply Br. at. 4–6, is equally unpersuasive.  It is reasonably
discernable that Commerce, in the final determination, did not re-explain its rationale for why
Prime Time's narrative of admissibility was insufficient to satisfy 19 C.F.R. § 351.301(c)(5), given
that Prime Time did not raise the challenge in either its request for reconsideration or case brief
to the agency.

Prime Time's submission as a questionnaire response.  19 C.F.R. § 351.104(a)(2)(iii); see also 19 C.F.R. § 351.302(d).

By contrast, Commerce's decision not to accept Prime Time's submission, offered as factual information not elsewhere defined as per 19 C.F.R. § 351.301(c)(5), and to remove it, along with the accompanying narrative of admissibility, from the record must be remanded.  First, Commerce acted contrary to law when it removed Prime Time's submission, offered as factual information not elsewhere defined under 19 C.F.R. § 351.301(c)(5), and the accompanying explanation, from the record.  The official record includes "all factual information, written argument, or other material developed by, presented to, or obtained by the Secretary during the course of a proceeding that pertains to the proceeding."  19 C.F.R. § 351.104(a)(1).  Commerce's regulation establishes that only unsolicited questionnaire responses and untimely information will be removed from the record.  19 C.F.R. § 351.104(a)(2)(iii).  There is no dispute as to the timeliness of Prime Time's submission.  Further, although styled as a questionnaire response, Prime Time contends that the submission provides information relevant to calculating an importer-specific assessment rate for its entries and should therefore be admissible under 19 C.F.R. § 351.301(c)(5).  See Prime Time's Br. at 23–31.  Therefore, Commerce acted contrary to law when it removed the submission and narrative of admissibility from the record.

Second, Commerce's rejection of the submission is unsupported by substantial evidence.  Submissions under 19 C.F.R. § 351.301(c)(5) must provide a detailed narrative explaining why the information is relevant and could not be otherwise submitted under 19

C.F.R. § 351.301(c)(1)–(4).   Commerce explicitly states that it rejected the submission under 19 C.F.R. § 351.301(c)(5) based on the insufficiency of Prime Time's explanation. Rejection Letter at 2.   The court cannot review the reasonableness of Commerce's decision because Commerce removed Prime Time's narrative of admissibility from the record.  The court cannot review what it cannot see.  On remand, Commerce must place Prime Time's submission and accompanying narrative of admissibility on the record.

Further, and for the reasons provide below, the submission may be necessary to calculate an importer-specific assessment rate for Prime Time's entries.  Commerce, in the final determination, did not consider whether the submission satisfied the requirements of 19 U.S.C. § 1677m(e) for the purposes of calculating an importer-specific assessment rate.   Instead, Commerce's 19 U.S.C. § 1677m(e) analysis, both in the rejection letter and in the final determination, focuses only on whether the information can be used to calculate Homey's margin.  Rejection Letter at 2; Final Decision Memo at 4–5.  On remand, Commerce must engage in such an analysis.

## II. Calculation of an Importer-Specific Assessment Rate

Commerce did not calculate an importer-specific assessment rate for Prime Time's entries.  Commerce explains that its practice is not to calculate such a rate unless it calculates a margin for each individually examined exporter.  See Rejection Letter at 2; Final Decision Memo at 6–7.  Commerce's regulation, 19 C.F.R. § 351.212(b)(1), directs it to calculate an importer-specific assessment rate and Commerce does not explain why its practice is reasonable in light of that regulation.   Accordingly, Commerce's determination is unsupported by substantial evidence.

Commerce must calculate a dumping margin for each entry of subject merchandise under review.  19 U.S.C. § 1675(a)(2)(A).  Further, pursuant to 19 C.F.R. § 351.212(b)(1), Commerce "normally will calculate an assessment rate for each importer of subject merchandise covered by the review. . . . by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes."[11]  19 C.F.R. § 351.212(b)(1).  No statute or regulation indicates that Commerce's obligation to calculate an importer-specific assessment rate varies based on whether the review concerns a market economy or a non-market-economy ("NME").  Further, no statute or regulation indicates that the "dumping margin" 19 C.F.R. § 351.212(b)(1) directs Commerce to use as the numerator in its calculation for the importer-specific assessment rate must be unique to the exporter being examined and cannot be an NME-entity rate.[12]

---

[11] As the KYD II court explained, it was Commerce that

> decided to determine importer-specific dumping margins as an alternate method for correctly attributing the antidumping duties that would result from determining entry-specific dumping margins. See 19 C.F.R. § 351.212(b)(1); [Antidumping Duties; Countervailing Duties,] 62 Fed. Reg. [27,296,] 27,314–15 [(Dep't Commerce May 19, 1997)] (justifying Commerce's prior shift from an entry-specific assessment method to an importer-specific assessment method); [Antidumping Duties; Countervailing Duties,] 61 Fed. Reg. [7,308,] 7,316–17 [(Dep't Commerce Feb. 27, 1996)] ("To the extent possible, these assessment rates will be specific to each importer, because the amount of duties assessed should correspond to the degree of dumping reflected in the price paid by each importer.").

KYD, Inc. v. United States, 35 CIT __, __, 779 F. Supp. 2d 1361, 1372–73 (2011) ("KYD II").

[12] In an administrative review, Commerce is required to "determine—(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry."  19 U.S.C. § 1675(a)(2)(A).  "The term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise[,]" 19 U.S.C. § 1677(35)(A), and constitutes the basis upon

(footnote continued)

Commerce explains that it has a practice of not calculating an importer-specific assessment rate, unless it first derives an individual margin for each examined exporter. Final Decision Memo at 6 (citing Rejection Letter at 2). Discernable from Commerce's explanation is that it does not consider an NME-entity rate, assigned to an exporter that failed to rebut the presumption of government control, to be an individually examined margin, and that it will only calculate an importer-specific assessment rate when it

------

which antidumping duties on entries under review are assessed. 19 U.S.C. § 1675(a)(2)(C). Commerce calculates a dumping margin for producers and exporters operating in market and non-market economy countries. In the NME-context, Commerce will construct a normal value by multiplying a party's factors of production and surrogate values and subsequently compare the resulting value to the exporter's U.S. sales price. 19 U.S.C. §§ 1677(35), 1677b(c); 19 C.F.R. § 351.408.

Commerce can calculate a dumping margin relying solely on a reviewed party's submissions, or if a party's actions trigger 19 U.S.C. § 1677e(a) by relying in whole or in part on facts otherwise available, or if trigger both 19 U.S.C. § 1677e(a) and (b) by applying an adverse inference to those facts. The Court of Appeals for the Federal Circuit in KYD, Inc. v. United States, 520 F. App'x 956 (Fed. Cir. 2013) (per curiam), affirmed this Court's decision that an importer was entitled to its own assessment rate even though the mandatory respondent's dumping margin was established through AFA. See generally KYD, Inc. v. United States, 36 CIT __, __, 807 F. Supp. 2d 1372, 1376–79 (2012); KYD II, 35 CIT at __, 779 F. Supp. 2d at 1367–84; KYD, Inc. v. United States, 34 CIT 528, 539–43, 704 F. Supp. 2d 1323, 1331–34 (2010) ("KYD I"). The court analyzed the relevant statutory and regulatory framework and determined that when record evidence allows Commerce to distinguish between unaffiliated importers, it is required to do so. KYD II, 35 CIT at __, 779 F. Supp. 2d at 1373. Here, Commerce rejected Prime Time's submission and specifically stated that it did not need to address whether the record contained information necessary to calculate a margin for Homey's sales to Prime Time. Final Decision Memo at 6–7.

Commerce and Defendant attempt to distinguish the KYD line of cases. See Final Decision Memo at 6; Def.'s Resp. Br. at 10–12; Def.'s Suppl. Br. at 3. Commerce argues that the crux of the issue in the KYD line of cases was whether Commerce corroborated the assigned rate, and not whether there is an obligation to calculate an importer-specific assessment rate. Final Decision Memo at 6. Defendant argues that the KYD cases involved a market economy and an AFA rate, as opposed to an NME-entity rate. See Def.'s Resp. Br. at 10–12, Def.'s Suppl. Br. at 3. KYD I specifically ordered Commerce to evaluate an importer's proffered information "in determining an assessment rate for [the importer's] entries or explain why it can decline to do so pursuant to 19 U.S.C. § 1677m(e)." KYD I, 34 CIT at 543, 704 F. Supp. 2d at 1334. KYD II, in turn, more succinctly explained the statutory and regulatory framework that imposes the obligation to calculate an assessment rate. KYD II, 35 CIT at __, 779 F. Supp. 2d at 1368–72.

calculates an individually examined margin.[13]  Neither Commerce's rejection letter nor its

final determination cites to any authority in support of this view.  In fact, in the final

determination, Commerce's sole support for its proposition that an exporter must be

individually examined before an importer-specific assessment rate can be calculated is

19 C.F.R. § 351.212(b)(1).  Commerce does not explain why its practice is reasonable in

light of its regulation.  Commerce does not claim that it is unable to calculate such a rate;

in fact, Commerce specifically states that the question of whether it has "the information

necessary to calculate a margin for [ ] Homey's sales to Prime Time" is not before it

because Homey is ineligible for a separate rate.[14]   Final Decision Memo at 6–7.

Whether the final rate is the result of Commerce applying an adverse inference to

facts otherwise available or using an individual exporter's own data does not negate the

fact that Commerce has assigned a rate.  Without further explanation, Commerce's

purported practice of only calculating an importer-specific assessment rate when an

exporter's rate is individually calculated is unsupported by substantial evidence.

Defendant contends that the regulation's use of the word "normally" implies that

there are exceptions to when Commerce is required to calculate an importer-specific

---

[13] Defendant advances the same argument.  Def.'s Suppl. Br. at 2.

[14] Commerce may be able to explain why its practice of not calculating an importer-specific assessment rate under certain factual conditions is reasonable.  It may be that the mechanics of calculating an importer-specific assessment rate, either when the exporter's individual rate is derived by resorting to AFA or a mandatory respondent fails to rebut the presumption of government control in the NME-context, would necessarily result in unreliable or distorted rates.  However, it is not for this court to provide a rationale supporting Commerce's determination.  It is for Commerce to explain and for the court to assess whether Commerce's stated practice is reasonable.  For Commerce to simply say that it will not carry out a calculation establishing an importer-specific assessment rate because it has a practice of not doing so, when its own regulation states that it will so calculate and without explaining the basis for the practice, is unreasonable.

assessment rate.  Def.'s Suppl. Br. at 2.  Defendant claims that Commerce does not

calculate an individual dumping margin for an exporter that fails to rebut the presumption

of government control.  Id.  As a result, Defendant contends, there is no dumping margin

to be used as the numerator in the importer-specific calculation.  Id. at 2–3; see also 19

C.F.R. § 351.212(b)(1). This interpretation cannot withstand scrutiny.  "Normally" in 19

C.F.R. § 351.212(b)(1) refers to the method Commerce will "normally" use to calculate

the importer-specific assessment rate; not whether it will calculate such a rate at all.[15]

When Commerce revised the relevant regulation, it remarked that the historical "master

list" or entry-by-entry method for calculating the assessment rate had become

burdensome because respondents were unable to tie individual entries to specific sales.

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,314 (Dep't

Commerce May 19, 1997).  Commerce crafted the method encapsulated in the regulation

as a new way for calculating the importer-specific assessment rate.  Commerce, however,

retained the "master list" method to be used only under specific circumstances and on a

case-by-case basis.  Id.  "Normally," therefore, refers to how Commerce will calculate the

importer-specific assessment rate and not when.  On remand, Commerce must either

explain why its practice of not calculating an importer-specific assessment rate where an

NME-entity rate is involved is reasonable; or determine whether it can use Prime Time's

submission to calculate an importer-specific assessment rate for the entries Prime Time

---

[15] Defendant argues that the use of the word "normally" in 19 C.F.R. § 351.212(b)(1) grants
Commerce discretion not to calculate an importer-specific assessment rate.  Def.'s Suppl. Br. at
2.  Defendant's argument cannot withstand scrutiny, as discussed above.  Moreover, it is
Defendant's argument, not Commerce's.  Commerce does not explain why the regulation grants
its discretion or why its practice is reasonable in light of the regulation.

imported.  If Commerce is unable to calculate such a rate, it will explain the basis for its

conclusion.

### III. Application of the PRC-wide rate to Prime Time's Entries

Plaintiff challenges Commerce's decision to assign Homey's PRC-wide rate to

Prime Time as unsupported by substantial evidence and not in accordance with law.

Prime Time's Br. at 31–35.  Specifically, it contends that in choosing the highest available

rate, i.e., the PRC-wide rate, Commerce should have given consideration to Prime Time's

efforts to populate the record with necessary information.  See id.; see also 19 U.S.C.

§ 1677e(d)(2).  Defendant responds that Commerce did not choose the PRC-wide rate

for Homey through an AFA analysis;[16] Homey simply failed to rebut the presumption of

government control and was assigned the default PRC-wide rate.  Def.'s Resp. Br. at 9–

12.  For the reasons that follow, the court agrees with the Defendant.

Commerce considers the PRC to be an NME-country.  Prelim. Decision Memo at

4–5.  In antidumping proceedings, Commerce presumes that the export activities of all

companies operating in an NME-country are subject to government control.  Id. at 5.

Commerce assigns all exporters of a given subject merchandise in an NME-country a

single antidumping duty rate.  Id.  The presumption is rebuttable; to rebut the presumption

and qualify for a separate rate, an exporter must demonstrate the absence of de facto

and de jure government control.  Id.  Commerce may establish an individual rate for the

---

[16] Parties and Commerce sometimes use the shorthand "AFA" or "adverse facts available" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination.  AFA, however, encompasses a two-part inquiry established by a statute.  See 19 U.S.C. § 1677e(a)–(b).  It first requires Commerce to identify information missing from the record, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available."  Id.

NME-country and assign that rate in future proceedings to all entities operating within that NME-country that fail to rebut the presumption.  See 19 C.F.R. § 351.107(d).[17]

Commerce did not, as Prime Time contends, rely on AFA to choose the PRC-wide entity's rate.  [Prime Time's] Reply Br. Supp. Rule 56.2 Mot. J. Agency R. at 16, Jan. 11, 2019, ECF No. 25.  The PRC-wide entity's rate was already established.  Commerce's use of facts available in this review relates solely to Homey's failure to rebut the presumption that it is part of the PRC-wide entity. The rebuttable presumption applicable in the NME-context sets the NME-entity rate as the default rate.  If a party fails to rebut the presumption of government control, it remains part of the NME-entity and is assigned the default NME-entity rate.[18]   In the final determination, Commerce determined that Homey was not eligible for a separate rate because it failed to respond to Commerce's Section A Questionnaire, as was required of it as a mandatory respondent.  Final Decision Memo at 6–7 (citing Prelim. Decision Memo at 5–6).  One can view Commerce's application of the established PRC-wide rate to Homey, by virtue of Homey failing to rebut

---

[17] Pursuant to 19 C.F.R. § 351.107(d), in antidumping proceedings involving imports from an NME-country, "'rates' may consist of a single dumping margin applicable to all exporters and producers."  See 19 C.F.R. § 351.107(d); see also Antidumping Proceedings, 78 Fed. Reg. 65,963, 65,964, 65,970 (Dep't Commerce Nov. 4, 2013) (announcement of change in department practice for respondent selection in [ADD] proceedings and conditional review of the [NME] entity in NME [ADD] proceedings).

[18] Prime Time erects a straw man when it argues that Commerce implicitly resorts to AFA to assign Homey the PRC-wide rate, and as a result, assigns Prime Time, a cooperating party, an AFA rate as well.  See generally Prime Time's Br. at 31–35; Prime Time's Reply Br. at 16–19. Prime Time's cooperation is irrelevant to the questions before Commerce.  Whether one views Homey's rate as a function of an adverse inference that Homey failed to rebut the presumption of government control or as simply Homey's failure to rebut that presumption with record evidence, Prime Time's cooperation is of no moment.  Homey is the exporter and the party that bears the burden of demonstrating independence or risk remaining part of the NME-entity for the purposes of this review.

the presumption of government control, as a facts available determination or a facts available determination with an adverse inference.  Either way, it was Homey's burden to rebut the presumption.  Commerce continued to consider Homey to be part of the PRC-wide entity and, therefore, it assigned Homey the established PRC-wide-rate.[19]  Id. at 7.

Relatedly, Plaintiff's argument that Commerce acted contrary to law by failing to consider Prime Time's efforts to populate the record, see Prime Time's Br. at 31–35, misconstrues the statutory scheme.  Prime Time, as the importer, is not the party whose actions are considered by Commerce when engaging in the adverse inferences analysis under 19 U.S.C. § 1677e(b).  The "interested party" the statute refers to is the party to whom Commerce directed its requests for information and to whom the adversely chosen rate would apply.  Accordingly, Commerce's decision not to consider Prime Time's efforts to comply with Commerce's requests for information is in accordance with law.  Further, the actions of an importer to comply with Commerce's requests for information are immaterial here and therefore Prime Time's substantial evidence challenge is unavailing.

**CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that Commerce's decision to reject and remove from the record Prime Time's submission, offered to replace Homey's lack of a response to a Sections C&D

---

[19] Here, the PRC-wide rate was last modified during the December 1, 1999, through November 30, 2000, review of the ADD Order.  Resorting to AFA, Commerce chose the highest available rate, which was an individually calculated rate for respondent Kaiyuan Group Corporation (Kaiyuan).  Issues & Decision Mem. Admin. Review Certain Cased Pencils from the [PRC] at 23–24, A-570-824, (July 16, 2002), available at http://ia.ita.doc.gov/frn/summary/prc/02-18856-1.pdf (last visited July 3, 2019).

questionnaire issued to it, as an unsolicited questionnaire response is sustained; and it is further

**ORDERED** that Commerce shall place on the administrative record Prime Time's submission, offered as other factual information not elsewhere defined, and the accompanying narrative of admissibility because Commerce's decision to remove both items was contrary to law; and it is further

**ORDERED** that Commerce's decision to reject Prime Time's submission as other factual information not elsewhere defined is remanded for reconsideration; and it is further

**ORDERED** that Commerce shall consider the information in Prime Time's submission to calculate an importer-specific assessment rate for Prime Time's entries, or explain why its practice of not calculating such a rate is reasonable, or if unable to calculate, explain the basis for its conclusion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination.


  /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: July 9, 2019
         New York, New York