Slip Op. 21-5

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **PRIME TIME COMMERCE LLC,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 18-00024** |
| **Defendant.** | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's remand redetermination in the 2015–2016 administrative review of certain cased pencils from the People's Republic of China.]

Dated: January 19, 2021

Mark B. Lehnardt and Lindita V. Ciko Torza Baker & Hostetler, LLP, of Washington, DC, for plaintiff.

Ashley Akers, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  Also on the brief was Patricia M. McCarthy, Assistant Director, Jeanne E. Davidson, Director, and Joseph H. Hunt, Assistant Attorney General.  Of Counsel on the brief was Brendan Saslow, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce") remand redetermination pursuant to the court's order in Prime Time Commerce LLC v. United States, 43 CIT __, __, 396 F. Supp. 3d 1319, 1334 (2019) ("Prime Time I").  See also Final Results of Redetermination Pursuant to Ct. Remand Order in [Prime Time I] Confidential Version, Oct. 7, 2019, ECF No. 39-1 ("Remand

Results"). In <u>Prime Time I</u>, the court remanded in part Commerce's final determination in the 2015–2016 administrative review of the antidumping duty ("ADD") order covering certain cased pencils from the People's Republic of China ("PRC"). <u>See</u> <u>Prime Time I</u>, 43 CIT at __, 396 F. Supp. 3d at 1334. The court ruled that Commerce's decision rejecting Prime Time's factual submissions was contrary to law. <u>See</u> <u>id.</u> at 1326–29, 1334. The court instructed Commerce to place Prime Time's submission on the record, review it, and determine whether the information would allow Commerce to calculate an importer-specific rate. <u>See</u> <u>id.</u> at 1326–29. Further, the court ruled that Commerce's refusal to calculate an importer-specific assessment rate was unsupported by substantial evidence. <u>See</u> <u>id.</u> 1329–32. On remand, Commerce reconsiders its rejection of Prime Time's factual submission, but nonetheless concludes that it cannot calculate an importer-specific assessment rate for Prime Time. <u>See</u> <u>Remand Results</u> at 3–16. For the following reasons, the court sustains Commerce's remand redetermination.

## BACKGROUND

The court presumes familiarity with the facts of this case, as set out in its previous remand order, and now recounts the facts relevant to disposition of this action. <u>See</u> <u>Prime Time I</u>, 43 CIT at __, 396 F. Supp. 3d at 1323–25. In response to timely requests, Commerce initiated its 2015–2016 administrative review of the ADD order covering certain cased pencils from the PRC. <u>See</u> <u>Initiation of Antidumping and Countervailing Duty Admin. Reviews</u>, 82 Fed. Reg. 10,457, 10,458–59 (Dep't

Court No. 18-00024                                                    Page 3

Commerce Feb. 13, 2017) ("Initiation Notice").  Pertinent here, Commerce selected

Ningbo Homey Union Co., Ltd. ("Homey") as the sole mandatory respondent for

individual examination.[1]  See Resp't Selection Memo. at 1, PD 23, bar code 3558523-

01 (Mar. 31, 2017) ("Resp't Selection Memo").[2]

    Since Commerce considers the PRC to be a non-market economy ("NME"),

unless a respondent demonstrates otherwise, Commerce presumes that all companies

within the PRC are subject to government-control and should be assigned a single

"country-wide" rate.  See, e.g., Import Admin., [Commerce], Separate-Rates Practice

and Application of Combination Rates in Antidumping Investigations involving

[NME] Countries, Policy Bulletin 05.1 at 1 (Apr. 5, 2005) ("Policy Bulletin 05.1")

(citations omitted), available at http://enforcement.trade.gov/policy/bull05-1.pdf (last

visited Jan. 12, 2021).   Although Homey initially sought to demonstrate its

independence from the country-wide entity by timely submitting a separate rate

---

[1] Commerce received requests for review of six companies, but after Orient
International Holding Shanghai Foreign Trade Co., Ltd. timely withdrew its request,
Homey was the only company left with entries during the period of review.  See Resp't
Selection Memo at 1.

[2] On March 26, 2018, Defendant submitted indices to the public and confidential
administrative records underlying Commerce's final determination.  These indices
are located on the docket at ECF Nos. 12-2–3.  On October 18, 2019, Defendant filed
indices to the public and confidential administrative records underlying Commerce's
remand redetermination. These indices are located on the docket at ECF Nos. 41-2–
3.  All references to documents from the initial administrative record are identified
by the numbers assigned by Commerce in the March 26th indices, see ECF No. 12,
and preceded by "PD" or "CD" to denote the public or confidential documents. All
references to the administrative record for the remand determination are identified
by the numbers assigned in the October 18th indices, see ECF No. 41, and preceded
by "PRR" or "CRR" to denote remand public or confidential documents.

application, it later stopped cooperating with Commerce's requests for information.
See Certain Cased Pencils From the [PRC], 82 Fed. Reg. 43,329, 43,330 (Dep't
Commerce Sept. 15, 2017) (preliminary results of [ADD] admin. review, prelim.
determination of no shipments, & rescission of review, in part; 2015–2016) ("Prelim.
Results") and accompanying Decision Memo for [the Prelim. Results] at 2, A-570-827,
PD 63, bar code 3614317-01 (Aug. 31, 2017) ("Prelim. Decision Memo").  Namely,
Homey did not respond to Commerce's AD questionnaire.  See Prelim. Decision Memo
at 2.

Prime Time, an unaffiliated importer of Homey's exports, sought to file
Sections C&D Questionnaire responses on behalf of Homey.  See Prime Time I, 43
CIT at __, 396 F. Supp. 3d at 1323; see also [Prime Time's] Req. Reconsideration at
2, PD 60, bar code 3604262-01 (Aug. 3, 2017).[3]  Commerce found that Prime Time's
questionnaire response constituted unsolicited factual information, rejected Prime
Time's submission along with Prime Time's accompanying narrative of admissibility,

---

[3] Prime Time explained that it submitted the questionnaire responses so that
Commerce could construct an ADD rate for Homey.  See Reply Br. of [Prime Time]
Supp. R. 56.2 Mot. for J. on Agency Record at 1, 18–19, Jan. 11, 2019, ECF No. 25.
At oral argument, Prime Time re-iterated that its objective in filing questionnaire
responses on behalf of Homey was to give Commerce the information it needed to
construct an exporter-specific rate for Homey, rather than a country-wide rate that
resulted from Homey's failure to meet the prerequisites for separate rate eligibility.
Oral Arg. at 11:30:32, Nov. 6, 2019, ECF No. 42 ("Oral Arg.").  With the questionnaire
responses Prime Time filed on behalf of Homey, Prime Time believed that Commerce
could have used facts available, plus gap-filling information, to construct Homey's
rate.  Id. at 11:32:05.  If Commerce constructed an exporter-specific rate for Homey,
then Commerce could have assigned an importer-specific rate to Prime Time—a rate
that Prime Time believed would be more favorable to it than the PRC-wide rate.  Id.

and removed all filings associated with Prime Time's submission from the record.  See

Prime Time I, 43 CIT at __, 396 F. Supp. 3d at 1323–24.  For its preliminary and final

determinations, Commerce concluded that Homey failed to meet the prerequisites for

separate rate eligibility, and further concluded that it could not calculate an importer-

specific assessment rate for Prime Time.  See Prelim. Decision Memo at 6; Certain

Cased Pencils From the [PRC], 83 Fed. Reg. 3,112, 3,112 (Dep't Commerce Jan. 23,

2018) (final results of [ADD] administrative review; 2015–2016) ("Final Results") and

accompanying Issues & Decision Memo: Certain Cased Pencil's from the [PRC]; 2015–

2016 at 4–5, 6–7, A-570-827, (Jan. 16, 2018), ECF No. 12-4 ("Final Decision Memo").

Commerce assigned the PRC-wide assessment rate of 114.90% to Homey's exports of

subject merchandise during the period of review.  See Final Results, 83 Fed. Reg. at

3,113.

On July 19, 2019, the court remanded aspects of Commerce's final

determination for further explanation or reconsideration.  See Prime Time I, 43 CIT

at __, 396 F. Supp. 3d at 1326–34.  Prime Time I held that, to the extent that Prime

Time's submission was offered as factual information not elsewhere defined pursuant

to 19 C.F.R. § 301.301(c)(5) (2017),[4] Commerce acted contrary to law by removing

Prime Time's submission and accompanying narrative of admissibility from the

record because Commerce's regulations establish that only unsolicited questionnaire

---

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2017 edition.

Court No. 18-00024                                                            Page 6

responses and untimely information will be removed from the record.  See Prime Time

I, 43 CIT at __, 396 F. Supp. 3d at 1326–29, 1334; see also 19 C.F.R.

§ 351.104(a)(2)(iii).[5]  The court also held that Commerce's attempt to justify its refusal

to calculate an importer-specific assessment rate based on agency practice was

unsupported by substantial evidence, because Commerce did not explain why its

practice is reasonable in light of its own regulation directing the calculation of such

a rate.  See Prime Time I, 43 CIT at __, 396 F. Supp. 3d at 1329–32.

On remand, Commerce accepts Prime Time's submission and evaluates it in

light of Prime Time's request that Commerce calculate an importer-specific rate.  See

Remand Results at 1–16.  However, Commerce continues to determine that it cannot

calculate an importer-specific assessment rate for Prime Time.  See id.  Commerce

instead explains why its practice of calculating an importer-specific assessment rate

only when it calculates a margin for an individually-examined exporter is reasonable,

even in light of its regulation directing the calculation of an importer-specific rate.

See id. at 5–8.  Moreover, Commerce explains why it can neither calculate an exporter

rate for Homey using Prime Time's factual submission, see Final Decision Memo at

4–5, nor can it calculate an assessment rate for Prime Time using the PRC-wide

entity rate or Prime Time's factual submission.  See Remand Results at 5–8.

---

[5] Moreover, because Commerce removed Prime Time's narrative of admissibility from
the record, the court held that Commerce's rejection of the factual submission was
unsupported by substantial evidence, as the very basis for that decision was not made
available to the court for review.  See Prime Time I, 43 CIT at __, 396 F. Supp. 3d at
1329.

Commerce received no comments on the draft results of its remand analysis.

See id. at 2.  Only after Commerce's final remand redetermination did Prime Time

submit comments before this court challenging Commerce's continued refusal to

calculate an importer-specific assessment rate.  See Pl. [Prime Time]'s Cmts. on

Remand Redetermination Confidential Version, Nov. 6, 2019, ECF No. 42 ("Prime

Time's Br.").  On December 6, 2019, briefing on Commerce's remand redetermination

concluded.  See Def.'s Reply to Cmts. on Remand Results, Dec. 6, 2019, ECF No. 44

("Def.'s Reply Br.").  On November 5, 2020, the court heard oral argument.  See Oral

Arg., Nov. 5, 2020, ECF No. 55 ("Oral Arg.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff

Act of 1930, as amended 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[6] and 28 U.S.C.

§ 1581(c) (2012),[7] which grant the court authority to review actions contesting the

final determination in an administrative review of an ADD order.  The court will

uphold Commerce's determination unless it is "unsupported by substantial evidence

on the record, or otherwise not in accordance with law[.]" 19 U.S.C.

§ 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are

also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture

(Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014)

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2012 edition.

[7] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

(quoting <u>Nakornthai Strip Mill Public Co. v. United States</u>, 32 CIT 1272, 1274, 587
F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I.   **Exhaustion**

Prime Time argues that Commerce ignored remand instructions to use Prime
Time's questionnaire responses, along with gap-filling information, to calculate a rate
for Prime Time; and, that Commerce's explanation regarding its practice of
calculating an importer-specific rate only when Commerce calculates a margin for an
individually-examined exporter, was insufficient and unreasonable.   <u>See</u> Prime
Time's Br. at 5–9.   In response, Defendant argues that Prime Time misstates the
remand instructions and that the court should not consider Prime Time's submissions
with respect to Commerce's refusal to calculate an importer-specific assessment rate
because Prime Time did not exhaust its administrative remedies.   <u>See</u> Def.'s Reply
Br. at 3–8.   Prime Time submits that the exhaustion requirement does not preclude
the court from considering arguments, where the issue before the court is a pure
question of law, and where doing so would have otherwise been futile.   <u>See</u> Prime
Time's Br. at 9–11.

"[T]he Court of International Trade shall, where appropriate, require the
exhaustion of administrative remedies."   28 U.S.C. § 2637(d).   Parties are required to
exhaust administrative remedies before the agency by raising all issues in their
initial case briefs before Commerce.   <u>See</u> <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363,

1375 (Fed. Cir. 2010) (citing to 19 C.F.R. § 351.309(c)(2), (d)(2); <u>Mittal Steel Point</u>
<u>Lisas Ltd. v. United States</u>, 548 F.3d 1375, 1383 (Fed. Cir. 2008)); <u>ABB, Inc. v. United</u>
<u>States</u>, 920 F.3d 811, 818 (Fed. Cir. 2019).  However, courts have recognized several
exceptions to the exhaustion requirement.  <u>See</u> <u>Itochu Bldg. Prods. v. United States</u>,
733 F.3d 1140, 1146 (Fed. Cir. 2013) ("<u>Itochu</u>") ("Requiring exhaustion may also be
inappropriate where the issue for the court is a 'pure question of law' that can be
addressed without further factual development or further agency exercise of
discretion." (quoting <u>Agro Dutch Indus., Ltd. v. United States</u>, 508 F.3d 1024, 1029
(Fed. Cir. 2007)); <u>see</u> <u>id.</u> ("[A] party often is permitted to bypass an available avenue
of administrative challenge if pursuing that route would clearly be futile, i.e., where
it is clear that additional filings with the agency would be ineffectual." (citing <u>Corus</u>
<u>Staal BV v. United States</u>, 502 F.3d 1370, 1378–79 (Fed. Cir. 2007)).

Prime Time's arguments are barred because they were not raised before
Commerce. After issuing the draft results of redetermination, Commerce invited
parties to comment, but none did.  <u>See</u> <u>Remand Results</u> at 2.  Prime Time claims that
raising its arguments before Commerce would have been futile, explaining that it
"has repeated its request that Commerce place gap-filling information on the record
on five prior occasions."  Prime Time's Br. at 10.  Prime Time conflates Commerce's
refusal to place gap-filling information on the record prior to having Prime Time's
questionnaire responses, with Commerce's refusal to place gap-filling information on
the record after having Prime Time's questionnaire responses.  Prime Time cannot

argue that prior attempts to have Commerce obtain and consider gap-filling information, or its questionnaire responses, render its efforts to have Commerce obtain and consider the gap-filling information now, under different circumstances, futile.

Prime Time cites a number of cases which do not support its position. See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (finding that plaintiff was precluded from introducing an invoice for the first time in its challenge before the CIT to the remand determination, where the underlying issue existed throughout the entirety of the proceedings); Hontex Enters. v. United States, 28 CIT 1000, 1004–06, 342 F. Supp. 2d. 1225, 1229–30 (2004) (confronting identical issue upon which the plaintiff had already commented); Holmes Prods. Corp. v. United States, 16 CIT 1101, 1103–04 (1992) (finding that plaintiff was precluded from challenging an agency decision, even though agency was aware of the issue, because no party objected); Valley Fresh Seafood, Inc. v. United States, 31 CIT 1989, 1994–96 (2007) (not requiring exhaustion where agency considered the issue and the plaintiff lacked "meaningful opportunity" to challenge agency's position).

Additionally, at oral argument, Defendant invoked Itochu, Oral Arg. at 11:24:22, in which a domestic nail manufacturer notified Commerce "that it no longer had an interest in receiving [ADD] relief from imports" of certain nails, and requested partial revocation of a standing ADD order. See Itochu, 733 F.3d at 1142–43. Itochu

Court No. 18-00024                                          Page 11

Building Products ("Itochu"), in support of that request, "submitted comments, and met with department officials" to advocate a proposed date for the revocation to become effective.  See id. at 1143.   Commerce preliminarily declined Itochu's requested date in favor of setting a date in accordance with Commerce's standard practice.  See id. at 1143–44.   Commerce invited interested parties to submit comments on its preliminary determination, however it stated that the receipt of comments would impact the publication date for the final results (up to 270 days if it received comments or up to 45 if it did not).  See id. at 1144.  Since submitting comments would have delayed the publication of Commerce's final results, and because Itochu did not have any new or different reasons supporting its proposed effective date, the Court of Appeals for the Federal Circuit ruled that Itochu was excused from the normal exhaustion requirement because it would have been futile and indeed harmful for Itochu to have to exhaust remedies.  See id. at 1146–47.

In Itochu, Commerce summarily rejected the domestic producers challenge to Commerce's choice of an effective date because of an established practice.  See id. at 1146–47.  Here, although Commerce has a practice to calculate importer-specific assessment rates only when Commerce calculates a margin for each individually-examined exporter, see Remand Results at 5, the court remanded to Commerce to consider Prime Time's submission "in the context of calculating an importer-specific assessment rate." See Prime Time I, 43 CIT at __, 396 F. Supp. 3d at 1323. Commerce therefore had to apply and justify its practice as reasonable in light of Prime Time's

Court No. 18-00024                                                    Page 12

submission.   Although Prime Time called upon Commerce to use gap-filling information it might have from other reviews, Commerce found that obtaining and utilizing gap-filling information in this case would not be appropriate given the amount and character of information missing from the record.   Specifically, Commerce lacked necessary factors of production and consumption data for Homey, as well as any expenses paid in connection with possible market economy purchases. See Remand Results at 9–14.  Without this information, Commerce explained, it could not calculate an accurate margin for Homey.  See id.  Commerce concluded that too many inaccuracies and distortions "would likely result from seeking to construct a proxy for Ningbo Homey's production process."   Id. at 14.   Prime Time now challenges Commerce's determination and argues that Commerce should use gap-filing information to calculate an importer specific rate.  See Prime Time's Br. at 5–11.   Yet, Commerce was not given an opportunity to respond to Prime Time's arguments in its remand redetermination; thus, the court cannot now assess Commerce's analysis in light of submissions advanced by Prime Time after the fact. The question of whether Commerce could reasonably obtain gap filling information and construct a proxy for Homey's production process prior to inclusion of Prime Time's questionnaire responses is distinct from the question of whether Commerce could do so after inclusion and consideration of Prime Time's responses.

Prime Time's argument that it was not required to exhaust remedies before Commerce because the issue presented is a pure question of law is also misplaced.

Prime Time argues that Commerce failed to comply with the remand order—an issue which Prime Time states is a pure question of law, for which exhaustion is not required.  See Prime Time's Br. at 9–10.  The court reviews Commerce's remand determination for compliance with the court's order below, however, Prime Time's argument misstates the court's remand order.   Prime Time suggests that this court ordered Commerce to put the gap-filling information on the record.  See id. at 5–7; Oral Arg. at 11:06:22.  The remand order directed Commerce to consider the information Prime Time had previously submitted, determine whether it could use the information to calculate an importer-specific rate, and if not, explain why.  See Prime Time I, 43 CIT at __, 396 F. Supp. 3d at 1334.  Commerce did consider whether it could use Prime Time's information to calculate such a rate, and it explained why it could not.  See Remand Results at 2, 5–16.  Given that Prime Time disagreed with Commerce's conclusion, it could, and should, have submitted comments on Commerce's draft results.

The question resolved in Prime Time I was whether Commerce reasonably determined that it could not consider the information Prime Time submitted to it. See Prime Time I, 43 CIT at __, 396 F. Supp. 3d at 1326–31.  In the remand order, the court instructed Commerce to consider whether, with Prime Time's information, it could calculate an importer-specific rate.  See id. at 1334.  Commerce concluded that it could not supplement the record with information from other sources to calculate a reliable importer-specific rate, even with Prime Time's information on the

record.  See Remand Results at 13–14.   Prime Time failed to exhaust administrative remedies, thus the court will not consider its arguments contesting Commerce's decision not to place gap-filling information on the record to calculate an importer-specific rate.

## II.    Calculation of an Importer-Specific Assessment Rate

The court remanded for further explanation, Commerce's determination that it could not calculate an importer-specific assessment rate in light of Prime Time's submission.  Commerce's explanation that it only calculates an importer-specific rate when it can calculate an exporter-specific rate, and that due to the amount of information missing from Prime Time's submissions, it would be unduly difficult, and in any event unreliable, to calculate an importer-specific assessment rate, is reasonable.

Commerce must calculate a dumping margin for each entry of subject merchandise under review.  See 19 U.S.C. § 1675(a)(2)(A).  Further, pursuant to 19 C.F.R. § 351.212(b)(1), Commerce "normally will calculate an assessment rate for each importer of subject merchandise covered by the review . . . by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes."  19 C.F.R. § 351.212(b)(1).

Commerce explains that, where it does not calculate a dumping margin for an examined exporter, its practice is to not calculate an assessment rate for a given importer of the subject merchandise because Commerce's calculation of that

Court No. 18-00024                                                    Page 15

importer's assessment rate is contingent on data provided by the exporter during the course of a review. See Remand Results at 5–8. According to Commerce, the term "dumping margin" used in 19 C.F.R. § 351.212(b)(1) refers to an exporter's "extended margin." Id. at 6. When Commerce determines the importer-specific assessment rate, it is determining what portion of an exporter's extended margin is attributable to entries of the subject merchandise made by each importer. See id. Commerce thus explains that calculating an exporter's "extended margin" is a prerequisite for calculating an importer-specific assessment rate. Id. at 6–7.

Elaborating on its methodology, Commerce explains that the extended margin is calculated by multiplying a figure Commerce refers to as the "potential uncollected dumping duties" ("PUDD") of an exporter's U.S. sales by the total quantity of the exporter's U.S. sales. Id. at 6. The PUDD represents the difference between ex-factory prices of a mandatory respondent's U.S. sales and the normal value of those sales. See id. & n.18 (citing Torrington Co. v. United States, 44 F.3d 1572, 1576, 1578 (Fed. Cir. 1995)). By multiplying the PUDD by the total quantity of the exporter's U.S. sales, Commerce derives the extended margin, which represents the universe of potentially uncollected dumping duties stemming from the respondent's sales of subject merchandise into the United States. See id. That extended margin serves as the basis for calculating the importer-specific assessment rate. See id. at 6–8. Namely, Commerce apportions the pool of potentially uncollected dumping duties arising out of a respondent's sales of subject merchandise into the U.S. amongst

Court No. 18-00024                                                                    Page 16

various importers by dividing that amount by the total value of the importer's entries

of subject merchandise from that respondent-exporter.  See id.  The resulting figure,

i.e., the importer-specific assessment rate, represents the amount of potentially

unpaid duties relating to a specific importer's entries.  See id. at 7.

      As such, Commerce submits that its practice of declining to calculate an

importer-specific assessment rate is reasonable, even though its regulation directs

that normally one will be calculated, because the extended margin is necessarily

unique to the exporter being examined.  See id. at 7–8; see also 19 C.F.R.

§ 351.212(b)(1).  Commerce adds that, although it could theoretically extract a PUDD

from the PRC-wide rate, since a PUDD extracted from the PRC-wide rate would "in

no way relate to the importer-specific entered value[,]" Commerce concludes that this

approach  would be "no more representative than using the [PRC]-wide rate for

assessment purposes."  Id. at 8 & n.8.

      Moreover, Commerce explains that although Prime Time submitted some

questionnaire information, it did not—because it could not—submit certain

information that is unique to Homey.  See Remand Results at 9–14.  In the Final

Results, Commerce explained that it would be unduly difficult for Commerce to obtain

gap-filling information to supplement Prime Time's submission and construct a proxy

rate for Homey because Prime Time's submission was too incomplete.  See Final

Decision Memo at 4–5; Remand Results at 9–16 & n.44.  On remand, Commerce

further explains that it cannot reliably fill in this missing information.  See id.[8]  In Prime Time's Section C submission, the "complete universe of sales" that Homey made was missing, and without this information, Commerce cannot properly conduct a differential pricing analysis which looks at all of the exporters sales and determines if there is "pattern of sales for comparable merchandise that differ significantly among purchasers, regions, or time periods in order to determine whether a pattern of prices differ significantly."  See id. at 10–11.  In Prime Time's Section D submission, information about the production and manufacturing process is missing, but is needed in order for Commerce to calculate Homey's normal values.  See id. at 12–14.

Commerce's practice, and consequent decision not to calculate an importer-specific assessment rate here, is reasonable.   Commerce explains its practice that it only calculates an importer-specific rate when it has calculated a rate for the corresponding exporter under review  and further explains why it chose not to obtain gap-filling information to create a proxy for Homey's production process.  See Remand Results at 5–14.  It is the burden of interested parties to populate the record; a burden which was not met in this case.  See BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1295 (Fed. Cir. 2019); Qingdao Sea-Line Trading Co. v. United States, 766 F.3d

---

[8] Prime Time argues that Commerce failed to comply with 19 U.S.C. § 1677m(e)(3) which states that it should not refuse to consider information that is "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination[.]"   However, Commerce has specifically stated that Prime Time's submission is insufficient to calculate either an exporter rate for Homey or an importer rate for Prime Time.  See Remand Results at 9–16.

Court No. 18-00024                                                                                          Page 18

1378, 1386–87 (Fed. Cir. 2014); <u>QVD Food Co., Ltd. v. United States</u>, 658 F.3d 1318,

1324 (Fed. Cir. 2011).

## CONCLUSION

For the foregoing reasons, Commerce's <u>Remand Results</u> are supported by

substantial evidence and comply with the court's order in <u>Prime Time I</u>, and are

therefore sustained.  Judgment will enter accordingly.


                                                            <u>/s/ Claire R. Kelly</u>
                                                            Claire R. Kelly, Judge

Dated:          January 19, 2021
                New York, New York